UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LARRY LAVOICE, on behalf of himself and all others similarly situated,<br><br>                        Plaintiff,<br><br>-against-<br><br>UBS FINANCIAL SERVICES, INC., UBS AG<br><br>                        Defendant. | Index No. 11 CIV 2308 (BSJ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO COMPEL ARBITRATION**

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Jeffrey G. Smith (JS 2431)
Robert Abrams (RA 7559)
Matthew M. Guiney (MG 5858)
270 Madison Avenue
New York, NY 10016
Telephone:  (212) 545-4600
Fax:  (212) 545-4653

***Attorneys for the Plaintiff***

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

        A.      STATEMENT OF RELEVANT FACTS ............................................ 1

                1.      The UBS Arbitration Agreements ............................................ 1

                2.      The New Jersey Arbitration Act
                        Governs the Arbitration Agreement........................................... 3

                3.      Plaintiff LaVoice ........................................................................ 4

                4.      Attorney Fees and Costs for Arbitration .................................. 6

II.     ARGUMENT ...................................................................................................... 8

        A.      CONTROLLING CASE LAW IN THIS CIRCUIT
                SUPPORTS DENIAL OF UBS' MOTION.......................................... 8

                1.      *AMEX I* Analysis....................................................................... 8

                2.      *Stolt-Nielsen* and *AMEX I* .................................................... 11

                3.      *Concepcion* .............................................................................. 14

                4.      *Sutherland* ............................................................................... 16

                5.      *D'Antuono* ............................................................................... 19

                6.      Defendants' Cited Authority Is Irrelevant or Inapplicable ...... 20

                7.      The FLSA Cannot Be Gutted By The FAA................................ 22

III.    CONCLUSION.................................................................................................. 23

# TABLE OF AUTHORITIES

## TABLE OF AUTHORITIES

**CASES**                                                                                          **Page(s)**

*14 Penn Plaza, LLC v. Pyett,*
  556 U.S. ___, 129 S. Ct. 1456 (2009)...................................................................23

*Adlao v. J.P. Morgan Chase & Co.,*
  No. C 10-04508 SBA,
  2011 U.S. Dist. LEXIS 30144 (N.D. Cal. Mar. 11, 2011)........................................4

*Agostini v. Felton,*
  521 U.S. 203 (1997).............................................................................................15, 16

*In re American Expresss Merchants' Litigation, (AMEX I)*
  554 F.3d 300 (2d Cir. 2009)................................................................................ *passim*

*In re American Expresss Merchants' Litigation, (AMEX II)*
  634 F.3d 187 (2d Cir. 2011)................................................................................ *passim*

*AT&T Mobility, LLC v. Concepcion,*
  131 S. Ct. 1740 (2011)......................................................................................... *passim*

*Carnegie v. Household International, Inc.,*
  376 F.3d 656 (7th Cir. 2004) ...............................................................................12, 17

*D'Antuono v. Service Road Corp.,*
  No. 3:11cv33 (MRK),
  2011 U.S. Dist. LEXIS 57367 (D. Conn. May 25, 2011)........................3, 19, 20, 21

*D'Antuono v. Service Road Corp.,*
  No. 3:11cv33 (MRK),
  2011 U.S. Dist. LEXIS 60721 (D. Conn. June 7, 2011)...........................................19

*Discover Bank v. Superior Court,*
  36 Cal. 4th 148 (2005) ................................................................................9, 14, 15, 19

*Gilmer v. Interstate/Johnson Lane Corp.,*
  500 U.S. 20 (1991)....................................................................................9, 12, 15, 23

*Green Tree Financial Corp.- Alabama v. Randolph,*
  531 U.S. 79 (2000)............................................................................................. *passim*

*Mitsubishi Motors Corp. v. Solar Chrysler-Plymouth,*
  473 U.S. 614 (1985).........................................................................................16, 23

*Nayal v. HIP Network Services IPA, Inc.,*
  620 F. Supp. 2d 566 (S.D.N.Y. 2009)..........................................................22

*Nunez v. Citibank, N.A.,*
  No. 08-CV-5398, 2009 WL 256107 (S.D.N.Y. Feb. 3, 2009)....................................21

*Pomposi v. GameStop, Inc.,*
  No. 09-340, 2010 U.S. Dist. LEXIS 1819 (D. Conn. Jan. 11, 2010)....................................21, 22

*Shalala v. Illinois Council on Long Term Care, Inc.*
  529 U.S. 1 (2000).........................................................................................16

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.,*
  130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010) ......................................................... *passim*

*Sutherland v. Ernst & Young,*
  No. 10 Civ. 3332 (KMW),
  2011 U.S. Dist. LEXIS 26889 (S.D.N.Y. Mar. 3, 2011) .................................................. *passim*

*Unicorn Bulk Traders Ltd. v. Fortune Maritime Enterprises, Inc.,*
  No. 08 Civ. 9710 (PGG), 2009 U.S. Dist. LEXIS 3576 (S.D.N.Y. Jan. 20, 2009) ...................21

## STATUTES AND RULES

Fair Labor Standards Act
  29 U.S.C. 216(a) ("Section 16(b)") ...........................................................22
  29 U.S.C. 216(c) ("Section 16(c)")............................................................22

FINRA Rules
  13204.........................................................................................3
  13510.........................................................................................4

New Jersey Labor & Workforce Development Rules
  12:105-4:10(a)................................................................................4

New Jersey Statutes
  § 34:11-58....................................................................................4
  § 34:13 A-2...................................................................................3
  § 34:13 A-7...................................................................................3
  § 34:13-4.....................................................................................4

## I.      INTRODUCTION

Defendant UBS moves to compel arbitration without citing the controlling precedent in this circuit and district. Plaintiff LaVoice fills in that lacuna. *See* Section II (A) below.

Plaintiff will show that it would be wholly irrational for him to elect arbitration in the present wage and hour dispute since the cost of such an arbitration procedure far exceeds the maximum potential arbitration award. In support of this conclusion, in accordance with the precedent in this circuit and district, Plaintiff presents his own affidavit as well as the affidavits of his counsel, Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") and an expert, Professor James Bicksler.

Plaintiff also shows that the arbitration agreements that he signed contained a fundamental confusion in that they invoked New Jersey arbitration law, which allows collective arbitration, and, at the same time, contained class and collective action waivers as well as class arbitration waivers.

## A.      STATEMENT OF RELEVANT FACTS

### 1.      The UBS Arbitration Agreements

UBS argues that Mr. LaVoice "entered into no fewer than eight binding arbitration agreements during his employment with UBSFS that included express class and collective action waivers." Def. Br. at 2.  The facts are more complicated.

UBS filed exhibits that included copies of its "Financial Advisor Compensation Plan" (the "Compensation Plans") for the years 2007, 2008, 2009 and 2010.  Declaration of Matthew Levitan ("Levitan Decl.") Exs. 4, 5, 1 and 6.  UBS also filed exhibits that included copies of a forgivable loan promissory note for the year 2002,[1] a "Strategic Objective Advance Agreement"

---

[1] Long before the beginning of the Federal Eligibility Period (2008) or the Class Period (2007). Compl. ¶¶ 3(a) and 3(b).

dated April, 2009, a promissory note dated April 8, 2009, a "Growthplus Agreement #15130" dated April 30, 2010 and a "Promissory Note #15130" dated May 14, 2010.  Levitan Decl. Exs. 7, 8, 9, 10 and 11.

The Compensation Plans appear to be statements of the programs and policies of UBS.[2] The promissory notes, however, relate only to so-called "forgivable loans" granted by UBS to its financial advisors.  Although the complaint in this case has nothing to do with "forgivable loans," it appears that the arbitration agreements included in these promissory notes cover all "compensation" claims.

Of the four Compensation Plan exhibits, only two were signed by Mr. LaVoice – the 2007 and 2009 Compensation Plans.[3]  Of the promissory note arbitration agreements, the 2009 and 2010 agreements were signed.  Thus, UBS has not presented any signed arbitration agreement for the year 2008.  Since it appears from the UBS exhibits that the Compensation Plans required annual signing by the FAs, it follows that there is no agreement between Mr. LaVoice and UBS to arbitrate any issue related to compensation for the year 2008.

Moreover, since the three-year "Federal Eligibility Period" begins on April 4, 2008, Compl. ¶ 3(a), and since UBS has produced no signed arbitration agreement for the year 2008, it follows that UBS' motion to compel arbitration cannot apply to the Federal Eligibility period for the year 2008.

Similarly, the "Class Period" begins on February 1, 2007, Compl. ¶ 3(b).  Thus, since

---

[2] Since there has been no discovery in this litigation, the full meaning of these documents remains to be discovered.

[3] Moreover, Mr. LaVoice's signature does not appear at the end of the Compensation Plan, where there is a place for such a signature, but in a copy of a separate document included as an exhibit.  Levitan Decl., Exs. 2 and 3.  Nothing in the Compensation Plan, however, provides for a signature in counterparts. In addition, there is no signature from any representative of UBS. Again, without discovery there are many unanswered questions about these documents.

there is no arbitration agreement for the year 2008, it follows that UBS' motion to compel arbitration cannot apply to the Class Period for the year 2008. *Cf. D'Antuono v. Service Road Corp.*, No. 3:11cv 33 (MRK), 2011 U.S. Dist. LEXIS 57367, at *55 (D. Conn. May 25, 2011) (motion to compel arbitration denied as to plaintiff who did not sign the arbitration agreement).

### 2.      The New Jersey Arbitration Act Governs the Arbitration Agreement

UBS argues that "[u]nder the Federal Arbitration Act ("FAA"), Plaintiff's arbitration agreements are binding and enforceable with respect to Plaintiff's individual FLSA and NYLL claims." Def. Br. at 1. In fact, the arbitration clause in the 2007 Compensation Plan declared unequivocally that compensation disputes would be "determined by arbitration as authorized and governed by the arbitration law of the state of *New York*." Levitan Decl., Ex. 4 (emphasis added). The arbitration clauses of the 2009 Compensation Plan, as well as the 2009 and 2010 promissory note arbitration clauses, declared unequivocally that compensation disputes would be "determined by arbitration as authorized and governed by the arbitration law of the state of *New Jersey*." Levitan Decl., Ex. 1 (emphasis added).

Importantly, New Jersey arbitration law was created primarily to resolve labor-management disputes. *See* N.J. Stat. § 34:13A-2 (Declaration of Policy) ("settlement of labor disputes"); N.J. Stat. § 34:13A-7 (Arbitration) (submit to arbitration "controversy … between an employer and his **employees**") (emphasis added).

In other words, New Jersey arbitration law not only permits, but also encourages, class arbitration. The Compensation Plan and promissory note arbitration agreements, however, contain collective and class **waivers**[4]:

---

[4] In addition, FINRA will not entertain class arbitrations. Rule 13204 ("Class action claims may not be arbitrated under the [Industry] Code.").

> By agreeing to the terms of this Compensation Plan to the fullest extent permitted by law, you **waive any right to commence, be a party to or an actual or putative class member of any class or collective action arising out of or relating to your employment with UBS or the termination of your employment with UBS.**

Levitan Decl., Ex. 1 at 19 (emphasis added).

Thus, the arbitration clauses of the Compensation Plan and the promissory notes carve out an exception to the New Jersey law that allows class arbitration. Nevertheless, the arbitration clauses do not acknowledge that the class waiver is a carve out from the New Jersey arbitration law. Therefore, there is a serious ambiguity in the arbitration agreements that make them so indefinite as to be unenforceably invalid.

In addition, there are extensive rules in New Jersey arbitration law and the UBS arbitration agreements are silent on which New Jersey rules "govern." There are, moreover, powerful conflicts between certain New Jersey arbitration rules and FINRA rules. *Cf.* New Jersey Labor and Workforce Development rules, § 12:105-4.10(a) ("the parties may offer such evidence as they desire") and N.J. Stat. § 34:13-4 (allows "subpoenas … for the attendance of witnesses …") and N.J. Stat. § 34:11-58 (Wage Claims) ("subpoena witnesses") with FINRA, 13510 (depositions "strongly discouraged in arbitration"). *See Adlao v. J.P. Morgan Chase & Co.*, No. C 10-04508 SBA, 2011 U.S. Dist. LEXIS 30144, at *12,14 (N.D. Cal. Mar. 11, 2011) (when language of arbitration clause is not "clear and explicit" the Court "cannot make a fully informed decision as to whether to compel arbitration") (citations and quotations omitted).

### 3.   **Plaintiff LaVoice**

Plaintiff Larry LaVoice was employed as a stock broker at UBS from August 2002 to July 2010. He is currently working as a stock broker in New York City. LaVoice Affidavit ("LaVoice Aff.") ¶ 2. As a stock broker his primary task was to sell financial products to his clients. LaVoice Aff. ¶ 3. Mr. LaVoice did not do any administrative work for UBS. LaVoice

4

Aff. ¶ 4.

      Mr. LaVoice understands that UBS believes that any claim that he has for compensation must be resolved in arbitration under the auspices of FINRA.   LaVoice Aff. ¶ 5.   He also understands that, presently, his claim has been brought as a class and collective action by his counsel, Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein").   If his claims cannot be brought through class action litigation in this Court, Mr. LaVoice will not submit his claims to arbitration because he believes, based upon his own analysis and discussions with his counsel, that the legal fees and costs required to bring an arbitration claim would be far greater than any award he could expect.   LaVoice Aff. ¶ 6.

      Mr. LaVoice understands that Wolf Haldenstein has taken the present litigation on a contingency basis and he understands what that means.   LaVoice Aff. ¶ 7.   He also understands that Wolf Haldenstein will not take his case on an hourly fee basis, i.e., non-contingent, and that the hourly rate for such a non-contingent fee would be about $600.   LaVoice Aff. ¶¶ 8 and 9. Mr. LaVoice also knows that there would probably also be an additional expert fee of between $40,000 and $50,000 in addition to legal fees of $425,000, not including non-expert expenses. LaVoice Aff. ¶ 10.

      Given those facts, Mr. LaVoice thinks that it would be "completely irrational" for him even to consider individual arbitration in this case, although he believes that his case has merit. LaVoice Aff. ¶ 11.   Based on his years of business experience, Mr. LaVoice also understands that there is a significant risk that he would receive nothing in an arbitration and, yet, would have to bear all of the costs of arbitration.   LaVoice Aff. ¶ 11.

      Mr. LaVoice estimated that he worked about 10 hours per week of overtime during the class period and federal eligibility period in this case.   LaVoice Aff. ¶ 13.   He also estimated that

he took about four weeks of vacation every year during which he did little or no work.  LaVoice Aff. ¶ 13.

Mr. LaVoice estimated that he earned about $250,000 annually during the period covered by this litigation.  LaVoice Aff. ¶ 14.  He estimated that his non-reimbursed business expenses during that period were about $10,000.  LaVoice Aff. ¶ 16.  That figure included regular "bonuses" for his assistant as well as expenses related to dining out with his clients and a very small amount for errors in transactions.  LaVoice Aff. ¶ 16 -18.

In regard to the UBS arbitration agreements, Mr. LaVoice states that he did not sign them voluntarily and that there was no negotiation over the terms.  LaVoice Aff. ¶ 19.

### 4.      Attorney Fees and Costs for Arbitration

As an arbitration, this case would be complex and would require the expenditure of over $400,000 in fees and costs in an attempt to obtain a damages award of approximately $100,000 for Mr. LaVoice.  Smith Affidavit ("Smith Aff.") ¶¶ 5- 16, and Bicksler Affidavit ("Bicksler Aff.") ¶ 10.  The same level of fees and costs would be required to bring an individual arbitration on behalf of any of the other twenty collective action members who have submitted their individual Consent to Become a Party Plaintiff.  Smith Aff. ¶ 8; Dkt No. 6.  At the same time, since most of those collective action members probably earned considerably less than Mr. LaVoice, their possible recoveries would be even less relative to the fees and costs.

Our estimates of the fees and costs associated with an individual arbitration in this case is based on our extensive experience in labor and employment claims.  Smith Aff. ¶¶ 3-4.

We have calculated Mr. LaVoice's overtime claim by taking his estimate of his hours worked, his annual income and the number of years included in his class and collective claims.  Smith Aff. ¶ 5.  We included in this estimate of $127,000 to $132,000 the doubling for liquidated damages allowed under the FLSA even though there is no guarantee that an arbitrator would do

so.  Smith Aff. ¶ 5.  Included in the fee and cost calculation of over $425,000 is some of the time already spent in researching and preparing Mr. LaVoice's claim.  Smith Aff. ¶ 8, et seq.

The estimate of fees and expenses is based upon the complexity of this case.  In particular, we expect that UBS would argue in arbitration that Mr. LaVoice is exempt from the FLSA and New York state law under the administrative and professional exemption provisions of both laws.  Smith Aff. ¶ 6.  This issue has been litigated extensively in class and collective actions in federal courts around the country and we would expect a major battle in arbitration over this unsettled issue.  Smith Aff. ¶ 6.  On this issue, our expert, Professor James Bicksler would be required.  Smith Aff. ¶ 6.

We also expect that the proof of overtime will be complex because it is our understanding that neither UBS nor Mr. LaVoice used punch cards or other written time records.  Smith Aff. ¶ 7.  As a result, extensive and costly discovery will be required including document production and depositions.  Smith Aff. ¶ 7.

On the basis of the costs outlined in the Smith affidavit, Wolf Haldenstein would decline to represent Mr. LaVoice except on an hourly basis and would not advise him to do so with other counsel.  Smith Aff. ¶ 17.  Nor would Mr. Smith recommend to his partners that they undertake this case as an individual arbitration on a contingency fee basis since there would be almost no likelihood that Wolf Haldenstein's time and expense would be recovered.  Smith Aff. ¶ 17.

Mr. LaVoice could seek other counsel but Wolf Haldenstein is not aware of any who could handle this case as an individual arbitration and be economically successful.  Smith Aff. ¶ 17.  Nor should Mr. LaVoice be forced to seek other counsel, especially since Wolf Haldenstein has served successfully as Mr. LaVoice's counsel in a prior wage and hour case.  Smith Aff. ¶ 17.

Finally, we have advised Mr. LaVoice that it would be reckless for him to count on the arbitrator shifting the fees to UBS even if Mr. LaVoice won all of his claims – an unlikely event in arbitration.  Smith Aff. ¶ 18.

## II.       ARGUMENT

**A.     CONTROLLING CASE LAW IN THIS CIRCUIT
SUPPORTS DENIAL OF UBS' MOTION         **

### 1.     *AMEX I* Analysis

The controlling case in this circuit is *In re American Express Merchants' Litigation*, 554 F.3d 300 (2d Cir. 2009) ("*AMEX I*") as reaffirmed by *In re American Express Merchants' Litigation*, 634 F.3d 187 (2d Cir. 2011) ("*AMEX II*").  In *AMEX I*, the Second Circuit reversed a district court ruling and denied a motion to compel arbitration in an anti-trust action brought against American Express by a group of merchants who accepted the American Express card from their customers.  In issuing its decision, the Second Circuit noted that the enforcement of a "mandatory arbitration clause" in a commercial contract that also contains a "class action waiver" or "collective action waiver" was a "matter of first impression in our court." *AMEX I* at 302.

The Second Circuit did not decide "whether class action waiver provisions are either void or enforceable per se."  *Id.* at 304.  Rather, the Court concluded "on the record before us, [that] the plaintiffs have adequately demonstrated that the class action waiver provision at issue should not be enforced because enforcement of the clause would effectively preclude any action seeking to vindicate the statutory rights asserted by the plaintiffs." *Id.*

The Court made it clear that the plaintiffs "expressly aver that they 'are not averse to proceeding in a class-wide arbitration,'" and are not, therefore, "seeking to revive 'the ancient judicial hostility to arbitration' as a form of dispute resolution." *Id.* at 310 (quoting *Halligan v.*

*Piper Jaffray, Inc.*, 148 F.3d 197, 200 (2d Cir. 1998)).[5]

The Second Circuit also held that it is the courts, not the arbitrators, who should decide the issue of whether the class action waiver is enforceable since the challenge is to the arbitration clause itself rather than to the "entirety of the Card Acceptance Agreement." *Id.* at 311.  Putting the federal policy favoring arbitration in perspective, the Court held that arbitration agreements should be "as  enforceable as other contracts, but not more so." *Id.* at 311-12.

Of particular importance in *AMEX I* and in the present case, the Court explained that Section 2 of the FAA, which provides that an agreement to arbitrate "shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," "creates a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA]." *Id.* at 312 (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  The Court then held that "the plaintiffs here have demonstrated that enforcement of the class action waiver in the Card Acceptance Agreement to cover their claims against Amex under federal antitrust statutes would be incompatible with the federal substantive law." *Id.*

Plaintiffs' claim in *AMEX I* was that the mandatory class action waiver in the Credit Card Agreement was not enforceable because "the practical effect of enforcement of the waiver would be to *preclude* their bringing Sherman act claims against AMEX in either an individual or collective capacity." *Id.* at 314 (emphasis added).  Much the same can be said here.  See affidavits of Smith and LaVoice.  The Court distinguished the Amex situation from the situation in a prior Supreme Court case, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991),

---

[5] This point is particularly important after the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) that the California *Discover Bank* rule was preempted by the FAA because it interfered with the functioning of the FAA.

where the Supreme Court rejected the argument that the class waiver was not enforceable merely because a federal statute (in that case, the ADEA) provided for class actions.

The reason for the preclusion in *AMEX I* was that the plaintiffs had demonstrated specifically that the cost of arbitration would far exceed the possible damage award.  Moreover, such a demonstration was the responsibility of the plaintiffs: "when 'a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs.'"  *Id.* at 315 (quoting *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000)).  The *AMEX I* court concluded that "the Card Acceptance Agreement therefore entails more than a speculative risk that enforcement of the ban will deprive them of substantive rights under the federal antitrust statutes."  *Id.* at 316.

In discussing the evidence in support of plaintiffs' argument, the Court noted that plaintiff had filed an affidavit from an economist expert who opined on the "likely costs and complexity of an expert economic study concerning the liability and damages."  *Id.* at 316.

The Court then held that "the plaintiffs here have also demonstrated that their antitrust claims against Amex can, for all intents and purposes, only be pursued through the aggregation of individual claims, either in class action litigation or class arbitration."  *Id.* at 317.  The same is true here where the amounts at issue in the overtime claims are far less than the reasonable costs of arbitration.

In regard to the cost of attorneys' fees, the Court noted that even where a statute allows for fee shifting "the plaintiffs must include the risk of losing, and thereby not recovering any fees, in their evaluation of their suit's potential costs."  *Id.* at 318.  The Court thus held that "the class action waiver in the Card Acceptance Agreement cannot be enforced in this case because to

10

do so would grant Amex de facto immunity from antitrust liability by removing the plaintiffs' only reasonably feasible means of recovery." *Id.* at 320.

At the end of the *AMEX I* decision the Second Circuit expressed two "caveats." First, they explained that they were not following the line of cases that relied on "findings of unconscionability under state law." *Id.* Instead, the Court said that it was relying on a "vindication of statutory rights analysis, which is part of the federal substantive law of arbitrability." *Id.* Thus, the relevant inquiry is not the "size" of any or all of the plaintiffs, but rather the showing that "the size of the recovery received by any individual plaintiff will be too small to justify the expenditure of bringing an individual action." *Id.*

The second caveat was that the *AMEX I* holding was not that "class action waivers in arbitration agreements are per se unenforceable." *Id.* at 321. Rather, "each case which presents a question of the enforceability of a class action waiver in an arbitration agreement must be considered on its own merits, governed with a healthy regard for the fact that the FAA 'is a congressional declaration of a liberal federal policy favoring arbitration agreements.'" *Id.* (quoting *Moses H. Cone*, 460 U.S. at 24). Thus, "'the enforceability of a particular class action waiver in an arbitration agreement must be determined on a case-by-case basis, considering the totality of the facts and circumstances.'" *Id.* (quoting *Dale v. Comcast Corp.*, 498 F.3d 1216, 1224).

## 2.   *Stolt-Nielsen* and *AMEX I*

Defendant Amex took *AMEX I* to the Supreme Court which vacated the judgment of *AMEX I* and remanded for further consideration in light of *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010). In *Stolt-Nielsen*, the Supreme Court had held that an arbitrator's decision to allow class arbitration, when the arbitration agreement was silent on the issue, violated the FAA requirement that an arbitration agreement was a contract

11

whose terms had to be given effect exactly as written.

On remand, *AMEX II*, the Second Circuit held that *Stolt-Nielsen* did not require a change in its holding in *AMEX I*: "*Stolt-Nielsen* states that parties cannot be forced to engage in a class arbitration absent a contractual agreement to do so.  It does not follow, as Amex urges, that a contractual clause barring class arbitration is *per se* enforceable.  Indeed, our prior holding focused not on whether the plaintiffs' contract provides for class arbitration, but on whether the class action waiver is enforceable when it would effectively strip plaintiffs of their ability to prosecute alleged antitrust violations." *AMEX II* at 193-94.[6]

The *AMEX II* court also stressed that "[c]lass action lawsuits are well-recognized by the Supreme Court as a vehicle for vindicating statutory rights. This is especially true with respect to the Court's recognition that the class action device is the only economically rational alternative when a large group of individuals or entities has suffered an alleged wrong, but the damages due to any single individual or entity are too small to justify bringing an individual action." *Id.* at 194.  The Court then quoted the famous line from *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) that "only a lunatic or a fanatic sues for $30."

The *AMEX II* court also distinguished the *Gilmer*, 500 U.S. 20, case in which the Supreme Court, in an ADEA case, held that an arbitration clause was enforceable because "it discerned no Congressional intent to preclude ADEA claims from being subject to arbitration." *Gilmer* explained: "'the fact that the ADEA provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred.'" *AMEX II* at 195 (quoting *Gilmer* at 32).

---

[6] The Court also cited First and Third Circuit cases that also "evaluate the enforceability of the class action waivers under the federal substantive law of arbitrability."  *Id.* at 194 (*Gay v. CreditInform,* 511 f.3d 369, 394-95 (3d Cir. 2007), *Kristian v. Comcast Corp.*, 446 F.3d 25, 63 (1st Cir. 2006)).

Once again, as in *AMEX I*, the *AMEX II* court explained that plaintiffs in *AMEX II* were not relying on the fact that the relevant statute at issue permitted class actions and that, therefore, any class action waiver would be invalid.   Rather, "the conundrum presented by the instant appeal is more nuanced: whether the mandatory class action waiver in the Card Acceptance Agreement is enforceable *even if the plaintiffs are able to demonstrate that the practical effect of enforcement of the waiver would be to preclude their bringing Sherman Act claims against Amex in either an individual or collective capacity*."   *Id.* at 196 (emphasis added).

The *AMEX II* court again held that the Supreme Court's decision in *Randolph*, 531 U.S. 79, was controlling in that it allowed for the possibility that a *demonstration* – not speculation – of costs sufficiently high as to be prohibitive of individual arbitration would result in rejection of a mandatory arbitration clause.   *Id*.   In support of that conclusion, the *AMEX II* court cited cases in the 4th and 7th circuits.[7]

The *AMEX II* court also held that "[e]radicating the private enforcement component from our antitrust law scheme cannot be what Congress intended when it included strong private enforcement mechanisms and incentives in the antitrust statutes."   *Id.* at 199 (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979)).   Similarly, in the present case, it cannot be the case that Congress would countenance the eradication of collective enforcement from the FLSA.

Although the *AMEX II* court agreed with defendant Amex that the *Stolt-Nielsen* court had rejected the arbitrator's use of public policy "as a means for divining the parties' *intent*," it allowed that "nothing in *Stolt-Nielsen* bars a court from using public policy to *find [a] contractual language void*."   *Id.* (emphasis added).

---

[7] *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 285 (4th Cir. 2007), *Livingston v. Assocs. Fin., Inc.*, 339 F.3d 553, 557 (7th Cir. 2003), *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002).

13

3.      *Concepcion*

*AMEX II* was decided on March 8, 2011.  On April 27, 2011, the Supreme Court decided *AT&T Mobility v. Concepcion*, 131 S. Ct. 1740 (2011).  The Second Circuit has requested letter briefing on whether *Concepcion* should cause it to reverse its ruling in *AMEX II*.  As of the date of this memorandum, although the letter briefing is complete as far as we know, the Second Circuit has not responded.  Moreover, another case in this district, *Sutherland v. Ernst & Young*, No. 10 Civ. 3332 (KMW), 2011 U.S. Dist. LEXIS 26889 (S.D.N.Y. Mar. 3, 2011), followed the reasoning in *AMEX I* in denying a motion to compel arbitration in a case also involving an FLSA claim for overtime.  Defendant E&Y has petitioned for reconsideration but, as of the date of this memorandum, the *Sutherland* court also has not issued a decision.

*Concepcion* invalidated the bright line rule established by the California Supreme Court in *Discover Bank v. Superior Court*, 36 Cal. 4th 148 (2005) as preempted by the FAA.  In *Discover Bank* the California Supreme Court held that a class action waiver in an arbitration agreement is unconscionable and unenforceable "when the waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money . . . ."  *Id*. at 162-63.  The consequence of a finding that a contract contained those attributes was to invalidate the arbitration clause in its entirety.  *Id*. at 163.

In *Concepcion*, the Ninth Circuit applied the *Discover Bank* rule despite a finding by the District Court that the specific arbitration regimen at issue there was "quick" "easy to use" and consumers likely would be "worse off" in litigation than in arbitration.  *See Concepcion* at 1745 (citations omitted).

14

That result was found by the Supreme Court to be inconsistent with its ruling in *Stolt¬Nielsen S. A.* as discussed above.  The Court ruled in *Concepcion* that "class arbitration, to the extent it is manufactured by *Discover Bank* rather than consensual, is inconsistent with the FAA."  *Concepcion* at 1751.  The Court then applied the federal preemption doctrine, and invalidated the *Discover Bank* rule.

There is an important difference between *Concepcion* and both *AMEX II* and the present case.  *Concepcion* involved a conflict between a federal statute, the FAA, and a state rule, the *Discover Bank* rule.  In *AMEX I* and *II* and the present case, there are federal statutes at issue – antitrust statutes and FLSA, respectively – as well as the FAA.  Without a state statute or rule of law, there is no question of federal preemption.  Rather, there is a question of whether the FAA must prevail in all situations regardless of whether it effectively provides a defendant with an end-run around another federal statute.  In other such cases, *e.g. Gilmer,* 500 U.S. 20, *Randolph*, 531 U.S. 79, the Supreme Court upheld class action waivers but on grounds different from that in *AMEX I* and *II* or the present case.  As discussed above, *Gilmer*, an ADEA case, upheld the waiver because a class action arbitration was available under NYSE rules in effect at that time.  In *Randolph*, the Supreme Court simply held that when a party seeks to invalidate a class action waiver on grounds of prohibitive costs, that party bears the burden of "showing the likelihood of incurring such costs."  *AMEX I* at 315.  Nothing in *Concepcion* suggests that *Gilmer* and *Randolph*, as interpreted by the Second Circuit, are no longer good law.  Moreover, it is well settled that the Supreme Court does not overrule its relevant precedent *sub silentio*, and *Concepcion* made no mention of either *Gilmer* or *Randolph*.  *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (lower courts may not "conclude our more recent cases have, by implication, overruled an earlier precedent" and must "leav[e] to this Court the prerogative of overruling its

own decisions"); *see also Shalala v. Ill. Council on Long Term Care Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

### 4.   *Sutherland*

On March 3, 2011, prior to *Concepcion*, a federal court in this district denied a motion to compel arbitration brought by the accounting firm Ernst & Young against a plaintiff who had brought an FLSA claim for overtime as in the present case.  *Sutherland*, 2011 U.S. Dist. LEXIS 26889.  Relying on *AMEX I*, the district court agreed with the plaintiff that "relative to her potential recovery, the enormous costs and fees attendant to prosecuting her claim on an individual basis would effectively prohibit her from bringing suit at all." *Sutherland*, at *4.  The plaintiff had filed an affidavit describing her situation including her potential recovery.  Also filed were affidavits from an accounting expert and the plaintiff's class action attorneys attesting to the great expense, relative to the possible award, attendant upon an individual arbitration claim.

In denying the motion to compel arbitration, the court held that "the arbitration of a statutory claim will be compelled only if that claim can be effectively vindicated in the arbitral forum." *Id.* at *6 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985), *Randolph*, 531 U.S. at 90, and *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 125 (2d Cir. 2010).  "Otherwise, the statute's 'remedial and deterrent function' would be circumvented … and the arbitral forum would 'lose its claim as a valid alternative to traditional litigation.'" *Id.* (quoting *Mitsubishi* at 637 and *Kristian v. Comcast Corp.*, 446 F.3d 25, 37 (1st Cir. 2006).  Then, quoting *Randolph,* the *Sutherland* court concluded that "where 'large arbitration costs' preclude a litigant from effectively vindicating her statutory rights in the arbitral forum, the arbitral agreement at issue may be unenforceable." *Id.*

The *Sutherland* court also dealt with the issue of the costs to the individual plaintiff versus the potential recovery, as the Second Circuit had done in *AMEX I* and *II*. *Id.* at *11. The court discussed the actual overtime loss, the potential liquidated damages under the FLSA, (uncontested) attorneys' fees, the expert's fee and the Court Equivalent Fee. *Id.* at *11-13 and fn 6. The court then concluded with the *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) quote that "only a 'lunatic or a fanatic' would undertake such an endeavor." *Id.* at *12 (quoting *Carnegie*).

The *Sutherland* court also rejected E&Y's argument that a "median" plaintiff could recover "substantially more" and that expert fees here amount to a "small fraction" of those at issue in *AMEX I*. *Sutherland* at*14 (quoting Def. Reply at 6-7): "The Amex decision did *not*, however, set a *cost-to-recovery ratio* below which claims are deemed 'prosecutable.' The court instead embraced a *functional approach*, which 'depends upon a showing that the *size of the recovery received by any individual plaintiff will be too small to justify the expenditure of bringing an individual action*.'" *Id.* (quoting *AMEX I* at 320) (emphasis added). The *Sutherland* court then distinguished E&Y's citations that purported to support their median plaintiff approach as "either inapposite or unpersuasive." *Id.* at *15.

The *Sutherland* court also considered the issue of whether Sutherland would even be able to obtain legal representation for an individual arbitration in her case[8]: "[w]hether attorney's fees and expenses incurred during arbitration are compensable is subject to the discretion of the arbitrators. The amount of such reimbursement is also left to the arbitrators' discretion." *Id.* at *16 (citing 29 U.S.C. § 216 (FLSA) providing for "'reasonable' attorneys' fees") (internal citation omitted).

---

[8] This is one of the points stressed in the LaVoice affidavit and the Smith Affidavit in the present case.

Affidavits in *Sutherland* revealed that "[c]ounsel for Sutherland will not prosecute her individual claim without charge, and will not advance the required costs where the E&Y Agreement's fee-shifting provisions present little possibility of being made whole." *Id.* at *17. Nor would Sutherland be able to "find [an] attorney willing to represent her under the circumstances." *Id.* (quoting *Kristian*, 446 F.3d at 60, "[I]t would not make economic sense for an individual to retain an attorney to handle one of these cases on an hourly basis and it is hard to see how any lawyer would advise a client to do so.").

Similarly, the *Sutherland* court rejected the possibility of retaining an attorney on a contingent fee basis. *Id.* at *18 (quoting *Kristian* at 59, "[I]t would not make economic sense for an attorney to agree to represent any of the plaintiffs in these cases in exchange for 33 1/3% or even a greater percentage of the individual's recovery."). Further, defendant E&Y had not submitted any evidence that an attorney would "expend approximately $200,000 in time and costs in return for a mere chance to earn potentially one-third of Sutherland's less than $4,000 recovery." *Id.*

On the basis of those affidavits, the *Sutherland* court concluded that "Sutherland cannot reasonably be expected to retain an attorney to pursue her individual claim, and E&Y has not submitted an affidavit stating otherwise." *Id.* at *17.

The *Sutherland* court concluded that with the option of individual arbitration foreclosed by costs and with the class waiver in the arbitration agreement, "E&Y would enjoy de facto immunity from liability for alleged violations of the labor laws." *Id.* at *19.

The *AMEX I* and *II* courts, and the *Sutherland* court, could also have made an additional argument *conforming* their already well-reasoned decisions to *Concepcion*, 131 S. Ct. 1740, in addition to *distinguishing* their cases from *Concepcion*. Justice Scalia made it very clear in

*Concepcion* that he found the *Discover Bank* rule to be essentially an *attack* on the FAA. The same could be said, however, for an *arbitration clause itself* in the context of a situation in which the costs of arbitration are prohibitive relative to the possible recovery. In such a situation, while class and collective actions are *explicitly* waived, individual arbitration itself is *implicitly* waived resulting in an attack on the FAA. Thus, the class waiver in an *AMEX II* or *Sutherland* case constitutes an attack on the FAA in much the same way as the *Discover Bank* rule was held to be in *Concepcion.*

### 5. *D'Antuono*

On June 7, 2011, a district court in the district of Connecticut filed an opinion denying a motion to compel arbitration in an FLSA class action brought on behalf of one topless dancer plaintiff and staying the action as to the motion to compel arbitration for two other plaintiffs pending the Second Circuit's response to the Connecticut Court's certified questions regarding the viability of *AMEX I* and *II*. *D'Antuono v. Service Road Corp.*, No. 3:11cv33 (MRK), 2011 U.S. Dist. LEXIS 60721 (D. Conn. June 7, 2011). As of the date of this brief, the Second Circuit has not responded to the *D'Antuono* court's questions.[9]

Importantly, the *D'Antuono* court held that "this case does *not* ultimately turn on *AT&T Mobility's* holding." *D'Antuono v. Service Road Corp.*, No. 3:11cv33 (MRK), 2011 U.S. Dist. LEXIS 57367 (D. Conn. May 25, 2011) (emphasis added). Nevertheless, the *D'Antuono* court said that it "cannot overlook that decision [*AT&T Mobility*] entirely because its reasoning *may be* at odds with reasoning in the Second Circuit's recent cases, including *American Express II* and *Ragone.*" *Id.* (emphasis added).

---

[9] Plaintiff's counsel in the present case suggested to UBS' counsel that the briefing on UBS' motion to compel arbitration be stayed pending the outcome of the *D'Antuono* certification and the *Sutherland* reconsideration motions. UBS' counsel refused. Plaintiff reserves his right to supplementary briefing should a decision issue from the Second Circuit or the Southern District.

The *D'Antuono* court also agreed with the Second Circuit's reliance on *Randolph* and *Randolph's* "dicta" that "the existence of large arbitration costs could preclude a litigant … from effectively vindicating her federal statutory rights in the arbitral forum." *Id.* at *63-4 (quoting *Randolph*, 531 U.S. at 90). The *D'Antuono* court characterized the *Randolph* "dicta" as a "carefully constructed standard … obviously designed to guide lower courts' resolution of arbitrability questions, and thus constitutes a judicial dictum that lower courts have *no choice but to follow*." *Id.* at *65 (emphasis added) (citing *U.S. v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975). Moreover, the *D'Antuono* court noted that "[a]ll the Courts of Appeal have appropriately adopted that [*Randolph*] standard." *Id.* (citing cases).

Oddly, however, the plaintiffs in *D'Antuono*, unlike the plaintiffs in *American Express II*, *Sutherland* and the present case, had not "shown any likelihood that they will incur prohibitively high costs if this Court enforces the arbitration clause, including the provision banning collective or class actions." *Id.* at *91. Given that reality, it is not clear why the *D'Antuono* court reached out to the Second Circuit as opposed to simply deciding the case before it.[10]

In the end, then, the *D'Antuono* court held that it "remains obligated to apply *American Express II*." *Id.* at *88, *Sutherland* at *8-9.

### 6.  Defendants' Cited Authority Is Irrelevant or Inapplicable

Defendants assert that courts "routinely enforce agreements to arbitrate overtime and other wage and hour claims" (Def. Mem. at 7 – 10) and that the court should compel plaintiff to arbitrate his individual claims here.  (Def. Mem. at 5 – 6).  Defendants' argument suffers from two fatal flaws.  First, nearly all of the cited authority for these sweeping conclusions have been

---

[10]  In the end, the *D'Antuono* court denied the motion to compel arbitration against one of the plaintiffs who had not signed the arbitration agreement, struck the class and collective allegations of two other plaintiffs who had signed the arbitration agreement, but stayed consideration of their claims and left the case pending. 55

collected from circuits outside of the Second Circuit and, consequently, outside of the *Amex II* framework set forth above.  Second, upon close inspection, the few controlling opinions cited simply do not support defendants' argument.

As set forth above, the Second Circuit analyzes the propriety of class action waivers under the *Amex II* framework.  Defendants' authority purportedly compelling arbitration of FLSA overtime claims from the Third, Fourth, Fifth, Ninth and Eleventh circuits are simply not binding on this court.  "This Court is bound to follow controlling Second Circuit precedent unless that precedent is overruled or reversed."  *Unicorn Bulk Traders Ltd. v. Fortune Maritime Enters., Inc*., No. 08 Civ. 9710 (PGG), 2009 U.S. Dist. LEXIS 3576, at *6 (S.D.N.Y. Jan. 20, 2009).  Furthermore, these sister circuits do not employ the *Amex II* analysis, which is still the law of this circuit.  "The United States Supreme Court has not overruled *American Express II, Ragone*, or any of the other cases adopting as a federal common law rule that courts may refuse to enforce arbitration agreements when, under the circumstances, they prevent plaintiffs from effectively vindicating their federal statutory rights."  *D'Antuono*, at *79.

That defendants chose to base their argument on out-of-circuit precedent is not surprising: the cited authority from this circuit simply does not support the argument presented. For example, in *Nunez v. Citibank, N.A*., No. 08-CV-5398, 2009 WL 256107 (S.D.N.Y. Feb 3, 2009), plaintiff did not bring the action as a class action, and, in fact, did not even oppose or address Citibank's motion to compel arbitration.  In *Pomposi v. GameStop, Inc*., No. 09-340, 2010 U.S. Dist. LEXIS 1819 (D. Conn. Jan. 11, 2010), the court enforced the arbitration agreement after an *Amex II* analysis because, *inter alia*, the agreement "expressly permit[ted] the award of reasonable attorney's fees and costs by the prevailing party" and, consequently, plaintiff failed to meet its "burden of showing that the disparity between potential recovery and

21

potential costs are so great that this case could not be effectively prosecuted on an individual basis." *Id*. at *22.  As set forth above, the instant arbitration agreement has no such protections. Finally, in *Nayal v. HIP Network Svcs. IPA, Inc*., 620 F. Supp. 2d 566 (S.D.N.Y. 2009), the court analyzed the arbitration agreement under New York state law, rather than on a vindication of statutory rights analysis, which is part of the federal substantive law of arbitrability.

### 7.     The FLSA Cannot Be Gutted By The FAA

The only case discussed above that involves an FLSA claim is *Sutherland*. Neither the Supreme Court nor the Second Circuit has considered whether the FAA (or, in this case, the New Jersey arbitration law) trumps the FLSA when the two clash.

Section 16(b) of the Fair Labor Standards Act, provides in relevant part that employees may bring a collective action on behalf of all those "similarly situated" for "unpaid overtime compensation" and "liquidated damages" in an "additional equal amount."   In addition, membership in the collective action requires the filing of a "consent in writing" with the court in which the action has been brought.  The FLSA also provides for "reasonable attorney's fee[s]" should the plaintiffs prevail.  29 U.S.C. § 216(b).

Under Section 16(c) of the Act an employee may settle an FLSA action and waive his rights to liquidated damages, only upon "payment in full" of any unpaid overtime, and supervision and agreement to the waiver by the Secretary of Labor.  29 U.S.C. § 216(c).

Under these sections, the FLSA guarantees the right to 1) liquidated damages, 2) collective action and 3) reasonable attorneys' fees.  In the present UBS arbitration agreement, none of these rights is expressly guaranteed and the collective action right is specifically waived. The issue is whether these rights can be considered lawfully waived in a non-negotiated arbitration agreement, or at all.

The Supreme Court has said that it is a question of Congressional intent.  As the Court

said in *Mitsubishi Motors Corp. v. Solar Chrysler-Plymouth,* 473 U.S. 614, 627 (1985), "it is the congressional intention expressed in [a] statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable."  Congress itself may "evince[ ] an intention to preclude a waiver of judicial remedies with the statutory rights at issue."  *See, Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, quoting *Mitsubishi Motors Corp.*, 473 U.S. at 628.  Moreover, the congressional intention "to include protection against waiver of [a statutory right] will be deducible from text or legislative history."  *Id.* at 29, *accord 14 Penn Plaza, LLC v.* Pyett, 556 U.S. __,129 S. Ct., 1456, 1465 (2009).

In addition, the Supreme Court has cautioned that the arbitration of statutory rights does not mean that those rights are surrendered: "[B]y agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum."  *14 Penn Plaza, LLC v. Pyett,* 556 U.S.__, at 1469, *quoting Mitsubishi Motors Corp.,* 473 U.S. at 628.

Thus, the FAA cannot deprive employees attempting to file a wage and hour collective action under the FLSA from exercising their right to file such claims in a court of competent jurisdiction.  Congress has clearly and unequivocally expressed its intent to protect the rights of employees to bring such collective actions.

### III.    CONCLUSION

For all of the reasons argued above, Plaintiff respectfully requests this Court to deny UBS' Motion to Compel Arbitration.

Dated:  New York, New York
        July 6, 2011

                                    **WOLF HALDENSTEIN ADLER**
                                    **FREEMAN & HERZ LLP**

                                    By: _Robert Abrams_
                                    Jeffrey G. Smith (JS 2431)
                                    Robert Abrams (RA 7559)
                                    Matthew M. Guiney (MG 5858)
                                    270 Madison Avenue
                                    New York, NY 10016
                                    Telephone:  (212) 545-4600
                                    Fax:  (212) 545-4653

                                    Attorneys for the Plaintiff