UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                   :

LARRY LAVOICE, on behalf of himself and :
all others similarly situated,
                   :

          Plaintiff,    :

                   :    11 Civ. 2308
          v.           :    (BSJ)(JLC)
                   :

                   :    **Memorandum and Order**

UBS FINANCIAL SERVICES, Inc., UBS AG, :
                   :

          Defendants.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

    Plaintiff Larry LaVoice ("LaVoice") was employed as a

Financial Advisor for Defendant UBS Financial Services Inc.

("UBS")[1] from August 2002 to July 2010.  LaVoice brings the

instant action asserting class and collective action claims for

UBS Financial Services, Inc. and UBS AG's (collectively

"Defendants") alleged violations of the Fair Labor Standards Act

---

[1] In his Amended Complaint, LaVoice identifies UBS Financial Services, Inc.
and UBS AG as Defendants in this action.  In their Memorandum of Law in
Support of their Motion to Compel Arbitration and Stay this Action,
Defendants allege that UBS Financial Services, Inc. was LaVoice's sole UBS
employer.  Mem. of Law in Support of Mot. to Compel Arbitration at FN1.
Defendants therefore argue that UBS Financial Services, Inc. is the only
proper defendant in the instant action.  Id.  LaVoice does not contest this
assertion by Defendants, and his Opposition to Defendant's Motion to Compel
Arbitration refers only to "Defendant UBS" and "UBS."  Opp'n to Def.'s Mot.
to Compel Arbitration.  Since neither LaVoice nor Defendants have provided
any further information regarding Defendant UBS AG, the Court assumes that
Defendants arguments are made on behalf of both named Defendants.

("FLSA"), the New York State Labor Department's Codes, Rules and Regulations ("NYCRR"), and the New York Labor Law ("NYLL"). In response to LaVoice's Amended Complaint, Defendants have filed the present Motion to Compel Arbitration and to Stay the Action pending the Completion of Arbitration. Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, Defendants move on the grounds that, in arbitration agreements signed by LaVoice during the course of his UBS employment, LaVoice agreed to individually arbitrate the claims made in his Amended Complaint. For the reasons discussed, the Court **GRANTS** Defendants' motion.

**FACTUAL BACKGROUND**

To support their argument that LaVoice agreed to limit his claims to arbitration, Defendants rely on several documents. The relevant documents are: (1) UBS' Financial Advisor Compensation Plan ("FA Compensation Plan") for the years 2007 through 2010; (2) an Employee Forgivable Loan Agreement dated August 26, 2002; (3) a Strategic Advance dated April 8, 2009; (4) a 2009 Promissory Note dated April 8, 2009; (5) a GrowthPlus Agreement dated April 30, 2010; and (6) a 2010 Promissory Note dated May 14, 2010.

With respect to the FA Compensation Plans, all of the plans contain the following individual arbitration agreement:

> [Y]ou and UBS agree that . . . any disputes between you and UBS including claims concerning compensation, benefits or other terms or conditions of employment

2

> and termination of employment . . . or any other
> claims whether they arise by statute or otherwise,
> including but not limited to claims arising under the
> Fair Labor Standards Act . . . or any other federal,
> state or local employment or discrimination laws,
> rules or regulations, including wage and hour laws,
> will be determined by arbitration . . . By agreeing to
> the terms of this Compensation Plan . . ., you waive
> any right to commence, be a party to or an actual or
> putative class member of any class or collective
> action arising out of or relating to your employment
> with UBS . . .

Decl. of Matthew Levitan, Exh. 1 at p. 19.[2]   The 2007 FA

Compensation Plan states that the arbitration "will be

determined by arbitration as authorized and governed by the

arbitration law of the state of New York." Id., Exh. 4 at p.

26.   The 2008, 2009, and 2010 plans are instead governed by the

"arbitration law of the state of New Jersey." Id., Exh. 1, 4,

5, and 6.   The 2007 and 2009 plans include LaVoice's signature,

but the 2008 and 2010 plans provided to the Court are without

signature. Id., Exh. 1, 4, 5, and 6.

The Loan Agreement, Strategic Advance, Promissory Notes,

and GrowthPlus Agreement (collectively the "UBS Loan

Agreements") all contain arbitration clauses.   Although the

exact terms of each clause differ slightly, each clause states

that the parties will arbitrate "any disputes . . . including

claims concerning compensation, benefits or other terms or

---

[2] The language quoted is taken from the FA Compensation Plan for 2008, but the
FA Compensation Plans for 2007, 2009, and 2010 each contain identical
language.

conditions of employment and termination of employment," as well as, claims arising under "any [] federal state or legal employment or discrimination laws, rules or regulations." Id., Exh. 7, 8, 9, 10, and 11.  In addition, the four most recent UBS Loan Agreements (those dated in 2009 and 2010) also include a class and collective action waiver which states that "Employee waives any right to commence, be a party to or an actual or putative class member of any class or collective action arising out of or relating to Employee's employment . . ."  Id., Exh. 8, 9, 10, and 11.  The 2002 Employee Forgivable Loan Agreement states that any ensuing arbitration will be governed by "the arbitration laws of the state of New York," whereas the later UBS Loan Agreements are governed by New Jersey's arbitration laws.  Although the 2002 Employee Forgivable Loan Agreement is unsigned, the remaining UBS Loan Agreements are all signed by LaVoice.

**STANDARD OF REVIEW**

"Courts apply a summary judgment standard when evaluating whether to compel arbitration pursuant to the FAA."  Sutherland v. Ernst & Young LLP, 768 F. Supp. 2d 547, 549 (S.D.N.Y. 2011) (internal citations omitted).  A motion to compel arbitration may be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is

4

entitled to judgment as a matter of law." Id. (citing Fed.R.Civ.P. 56(c)). "A party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79, 91 (2000) (internal citations omitted). "[W]here [] a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." Id. at 92.

"Once a court is satisfied that an arbitration agreement is valid and the claim before it is arbitrable, it must stay or dismiss further judicial proceedings and order the parties to arbitrate." Nunez v. Citibank, N.A., No. 08 Cv. 5398, 2009 WL 256107 at *2 (S.D.N.Y. Feb. 3, 2009) (internal citations omitted).

**DISCUSSION**

In the instant action, LaVoice asserts causes of action grounded in the FLSA and New York state statutes. As a general matter, when a party bound by an arbitration agreement raises a claim founded on statutory rights, a district court must determine: "(1) whether the parties agreed to arbitrate; (2) the scope of that agreement; [and] (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable." Id. at *3.

5

With respect to the first prong of the analysis, whether
the parties intended to arbitrate, LaVoice has only challenged
the existence of an agreement to arbitrate for the year 2008.
LaVoice bases this argument on the grounds that UBS has not
produced any signed agreement for that year.  Since LaVoice does
not contest that the 2007 FA Compensation Plan contains an
applicable arbitration agreement without temporal limitation,
and the Second Circuit has held that in the absence of such a
limitation "the relevant inquiry is whether [the party's] claims
relate to any obligation or claimed obligation under the
[arbitration] agreement, not when they arose," Smith/Enron
Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Intern.,
Inc., 198 F.3d 88, 99 (2d Cir. 1999), the Court finds LaVoice's
arguments regarding his 2008 claims unavailing.

Turning to the second prong of the analysis, the scope of
the agreements themselves, LaVoice argues that the agreements
governed by New Jersey law[3] cannot be enforced because they are
ambiguous.  In support of this argument, LaVOice asserts that
the class waiver provisions of the relevant agreements
contradict the New Jersey Arbitration Act, which encourages
class arbitration.  The Court disagrees with LaVoice's reading

---

[3] The 2009 FA Compensation Plan and the 2009 and 2010 UBS Loan Agreements state
that they will be governed by the "arbitration law of the state of New
Jersey."

6

of the agreements and the law of New Jersey.[4]  Even if the Court

accepts LaVoice's argument that the New Jersey Arbitration Act

encourages class arbitration, it does not follow that the Act

prohibits arbitration agreements which waive the right to

collective relief.  The agreements and class waiver provisions

at issue are clear on their face.  The Court therefore finds

that LaVoice has provided insufficient grounds to find that the

arbitration agreements between LaVoice and UBS are

unenforceable.[5]

---

[4] In a letter brief to the Court, LaVoice cites Dreyfuss v. eTelecar Global
Solutions-U.S., Inc., 2008 U.S. Dist. LEXIS 96945 at *3 (S.D.N.Y. Nov. 19,
2008), in further support of his argument that the agreement is unenforceable
as ambiguous.  The Court finds Dreyfuss inapposite to the present case
because that case involved an arbitration agreement which was missing several
pages, including pages alleged to contain essential terms.  LaVoice has also
referred the Court to JetBlue Airways Corp. v. Stephenson, 88 A.D.3d 567
(N.Y. App. Div. 2011) and NAACP of Camden County East v. Foulke Management
Corp., 421 N.J. Super. 404 (N.J. Super. Ct. App. Div. 2011).  The Court does
not read either JetBlue Airways or NAACP of Camden County East as supporting
LaVoice's arguments.  Both cases involved arbitration agreements which differ
significantly from the present case, JetBlue involved an agreement without a
class waiver provision and the NAACP case involved an agreement with
"multiple, conflicting, and unclear clauses spanning three different
documents.  NAACP of Camden County East v. Foulke Management Corp., 421 N.J.
Super. At 437.  In addition, the JetBlue case involved a motion to stay
arbitration, whereas the current motion is one to compel arbitration.  Given
the inapposite facts presented, the Court finds both of these cases
unpersuasive for LaVoice's argument.

[5] The Court's position would remain unchanged even if LaVoice were to make the
argument that the class waiver provisions were unenforceable as a matter of
New Jersey Law.  The Third Circuit recently held that such arbitration
agreements are enforceable in New Jersey even in the face of New Jersey
Supreme Court precedent that the class waivers contained therein are
unconscionable as a matter of law.  See Litman v. Cellco P'ship, 655 F.3d 225
(3d Cir. 2011).

Beyond his arguments regarding 2008 and the application of New Jersey law, LaVoice does not otherwise appear to contest that: (1) LaVoice and UBS agreed to arbitrate in the FA Compensation Plans and the UBS Loan Agreements; and (2) the scope of the arbitration agreements captures the FLSA and New York employment claims made in the Amended Complaint.  Nor does LaVoice appear to claim that Congress intended for FLSA and state labor law claims to be nonarbitrable.

LaVoice does, however, challenge the essential arbitrability of his claims.  Under Section 2 of the FAA, an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2 (emphasis added).  Relying on this provision, LaVoice's Opposition to the Motion to Compel Arbitration primarily rests on a general argument that, as a result of Section 2's "sav[ing]" clause for agreements unenforceable "upon such grounds as exist at law," his claims are unarbitrable under the FAA.  Id.  Relying on his reading of the Second Circuit's opinion in In re American Express Merchants' Litigation, 554 F.3d 300 (2d Cir. 2009) ("Amex I") as reaffirmed in In re American Express Merchants' Litigation, 634 F.3d 187 (2d Cir. 2011) ("Amex II"), LaVoice specifically argues that the class waiver provisions contained in the arbitration agreements between LaVoice and UBS are

unenforceable.  LaVoice therefore argues that, since enforcement
of the class waiver provisions would be contrary to the law of
this Circuit, his claims are unarbitrable.

In order to commence its analysis, the Court now turns to
Amex I and II, as well as, to the recent Supreme Court decision
in AT&T Mobility, LLC v. Concepcion, 131 S. Ct. 1740 (2011).

**Amex I and II**

In Amex I, the Second Circuit considered the enforcement of
a mandatory arbitration clause which forbid the parties to the
contract from pursuing anything other than individual claims in
the arbitral forum.  Amex I, 554 F.3d at 302.

Plaintiffs in Amex I were merchants who had accepted the
Defendant, American Express', charge cards and were forced to
agree to accept American Express credit and debit cards.  Id. at
305.  Plaintiffs alleged that American Express had used an
illegal "tying arrangement" to compel merchants to accept
American Express' revolving credit card products at a rate which
vastly exceeded the rate for comparable competitor products.
Id. at 308.  Responding to American Express' motion to compel
arbitration, plaintiffs argued that enforcement of the class
action waiver incorporated in the arbitration agreement between
the parties would effectively strip them of their ability to
assert claims.  Id.  In support of this argument, plaintiffs
asserted that the discovery costs associated with pursuing an

9

individual claim would amount to hundreds of thousands of dollars, whereas the average damages sought by each plaintiff was only $5000.  Id.

Deciding the motion to compel, the district court held that "the enforceability of the collective action waivers is a claim for the arbitrator to resolve" and concluded that all of the plaintiffs' substantive antitrust claims were subject to arbitration.  Id. at 309.

Reversing the decision of the district court, the Second Circuit Court of Appeals first held that the district court erred in holding that the question of the class action waiver's enforceability was a matter for the arbitrator.  Id. at 310-11. The Second Circuit then proceeded to consider the enforceability of the class action waiver contained in the arbitration agreement between the parties.  Id.  After finding that when "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, the party bears the burden of showing the likelihood of incurring such costs," Id. at 315 (citing Randolph, 531 U.S. at 92), the Second Circuit went on to hold that "plaintiffs here have [] demonstrated that their antitrust claims against Amex can, for all intents and purposes, only be pursued through the aggregation of individual claims, either in class action litigation or in class arbitration."  Id. at 317.  The Second

10

Circuit therefore ultimately held that "the class action waiver in the Card Acceptance Agreement [arbitration agreement between the parties] cannot be enforced in this case because to do so would grant Amex de facto immunity from antitrust liability by removing the plaintiffs' only reasonably feasible means of recovery." Id. at 320.

Subsequent to the Second Circuit's decision in Amex I, the Supreme Court decided Stolt-Nielsen S.A. et al., v. Animal Feeds International Corp., 130 S. Ct. 1758 (2010). In Stolt-Nielsen, the Supreme Court vacated a Second Circuit decision and held that a panel of arbitrators could not compel class arbitration when the arbitration agreement was silent on the issue and the parties had stipulated that there was no agreement on this question. Id. at 1776. Weighing into the Supreme Court's decision was its view that "the arbitration panel [had] imposed its own policy choice and thus exceeded its powers." Id. at 1770. Following its decision in Stolt-Nielsen, the Supreme Court granted Defendant American Express' writ for certiorari, vacating and remanding to the Second Circuit for reconsideration in light of its recent decision.

Once the Amex I case returned to it from the Supreme Court, the Second Circuit again considered in Amex II the question that had been presented for its consideration in Amex I: "whether the mandatory class action waiver in the Card Acceptance Agreement

is enforceable even if the plaintiffs are able to demonstrate that the practical effect of enforcement of the waiver would be to preclude their bringing Sherman Act claims against Amex in either an individual or collective capacity." Amex II, 634 F.3d at 196. Disagreeing with the Defendant that Stolt-Nielsen compelled a different result, the Second Circuit reaffirmed its earlier decision in Amex I and held in Amex II that the arbitration agreement was unenforceable because "the class action waiver in this case precludes plaintiffs from enforcing their statutory rights." Id. at 199.

## AT&T Mobility

Since the Second Circuit issued its opinion in Amex II, and prior to Defendants filing their present Motion to Compel Arbitration, the Supreme Court re-examined the question of class action waivers in an arbitration context in the case AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740 (2011) ("AT&T Mobility"). Plaintiffs in AT&T Mobility were individual cell phone customers who argued that, because the class waiver provision contained in their arbitration agreement was unconscionable under California law, their claims were unarbitrable under Section 2 of the FAA. Id. at 1746.[6] The

---

[6] As a result of the California Supreme Court's decision in Discover Bank v. Superior Court, 36 Cal. 4th 148 (2005), California applies the following framework to class action waivers in arbitration agreements. "[W]hen the waiver is found in a consumer contract of adhesion in a setting in which

Ninth Circuit had affirmed the district court's denial of the motion to compel arbitration on the grounds that the class waiver provision was unconscionable under California law as announced in the California Supreme Court's decision in <u>Discover Bank v. Superior Court</u>. <u>Laster v. AT&T Mobility LLC</u>, 584 F.3d 849, 853-55 (9th Cir. 2009) (internal citations omitted).

Writing the majority opinion for the court, Justice Scalia noted that "[w]hen state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." <u>AT&T Mobility</u>, 131 S. Ct. at 1747. Justice Scalia observed, however, that <u>AT&T Mobility</u> presented a case where "the inquiry becomes more complex" because it involves "a doctrine normally thought to be generally applicable, such as duress or, as relevant here, unconscionability, [that] is alleged to have been applied in a fashion that disfavors arbitration." <u>Id.</u>

Analyzing the goals of the statute, the Supreme Court first determined that "[a]lthough § 2's saving clause preserves generally applicable contract defenses, nothing in it suggests

---

disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money, then. . . the waiver becomes in practice the exemption of the party from responsibility for its own fraud, or willful injury to the person or property of another. Under these circumstances, such waivers are unconscionable under California law and should not be enforced." <u>Id.</u> at 162.

an intent to preserve state-law rules that stand as an obstacle
to the accomplishment of the FAA's objectives." Id. at 1748.
The Supreme Court further defined the principal objective of the
FAA as "ensur[ing] that private arbitration agreements are
enforced according to their terms." Id. With this view of the
FAA in mind, the Supreme Court therefore overturned the Ninth
Circuit's decision to deny the motion to compel and held that
"[b]ecause it stands as an obstacle to the accomplishment and
execution of the full purposes and objectives of Congress,
California's Discover Bank rule is preempted by the FAA." Id.
at 1753. In reaching its decision, the Supreme Court held both
that "[r]equiring the availability of classwide arbitration
interferes with the fundamental attributes of arbitration and
thus creates a scheme inconsistent with the FAA," Id. at 1748,
and that "States cannot require a procedure that is inconsistent
with the FAA, even if it is desirable for unrelated reasons."
Id. at 1753.

**Analysis**

Turning now to the present action, the Court finds that
LaVoice has provided insufficient evidence to support a finding
that his claims are unarbitrable under the FAA. Although
Defendants argue in the first instance that the Second Circuit's
Amex I and II decisions do not survive the Supreme Court's
decision in AT&T Mobility, the Court need not reach the question

14

of whether the Second Circuit's <u>Amex</u> holding has been overturned by <u>AT&T Mobility</u> because it finds that LaVoice's claims are arbitrable under both decisions.[7]

### Absolute Rights to Collective Action under the FAA

In his opposition, LaVoice makes the argument that the "FLSA cannot be gutted by the FAA." Pl. Mem. of Law in Opp'n to Def.'s Mot. to Compel Arbitration at 22. This argument effectively suggests that the FLSA "guarantees the right to...collective action" which cannot be "lawfully waived in a non-negotiated arbitration agreement, or at all," <u>Id.</u> The Court finds this argument, which assumes that a collective action requirement can be consistent with the FAA, precluded in light of the Supreme Court's decision in <u>AT&T Mobility</u>. Given that the Supreme Court held in <u>AT&T Mobility</u> that "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA," this Court must read <u>AT&T</u> Mobility as standing against any argument that an absolute right to collective action is consistent with the FAA's "overarching purpose" of "ensur[ing] the enforcement of arbitration

---

[7] The Court notes that an interlocutory appeal to the Second Circuit has been certified in <u>D'Antuono, et al. v. Serv. Rd. Corp, et al.</u>, No. 3:11cv33, 2011 U.S. Dist. LEXIS 60721 (D. Conn. June 7, 2011). The appeal seeks for the Circuit to respond precisely to the question of whether <u>Amex II</u> remains good law in light of the Supreme Court's decision in <u>AT&T Mobility</u>.

agreements according to their terms so as to facilitate
streamlined proceedings." AT&T Mobility, 131 S. Ct. at 1748.
To the extent that LaVoice relies on the decision in Raniere, et
al. v. Citigroup, Inc., 2011 U.S. Dist. LEXIS 135393 (Nov. 22,
2011, S.D.N.Y.) or the recent decision of the National Labor
Relations Board ("NLRB") in D.R. Horton, Inc. and Michael Cuda,
Case 12-CA-25764, January 3, 2012, as authority to support a
conflicting reading of AT&T Mobility, this Court declines to
follow these decisions.

### Preclusion of Statutory Rights

In addition to arguing that the FLSA creates an unwaiveable
right to collective action, LaVoice also argues that the
arbitration agreements between him and UBS are unenforceable
because they would preclude him from exercising his statutory
rights.  To support this position, LaVoice likens the class
waivers in the instant case with those that were found
unenforceable in the Amex line of cases.  LaVoice also draws
comparison between his circumstances and those of the plaintiff
in Sutherland v. Ernst & Young LLP, 768 F. Supp. 2d 547
(S.D.N.Y. 2011).

The enforceability of a class action waiver in an
arbitration agreement must be considered on a case-by-case basis
"on its own merits, governed with a healthy regard for the fact
that the FAA is a congressional declaration of a liberal federal

policy favoring arbitration agreements." Amex II, 634 F.3d at 199. Turning to the class waiver at issue and LaVoice's specific circumstances, this Court finds that the "practical effect of enforcement of the waiver" in the instant case would not "preclude" LaVoice from exercising his rights under the statutes. Id. at 196. The Court comes to its finding that LaVoice's statutory rights will not be precluded by enforcement of the class waiver after reviewing his submissions regarding: his estimated damages claim, his estimated attorneys' fees, his estimated expert fees, his disinclination to pursue his claims individually, his counsel's disinclination to pursue the claims individually, and his likelihood of success at arbitration.

Although LaVoice and Defendants contest the value of LaVoice's overtime claim, in reaching its decision, the Court accepts the figure cited in LaVoice's own opposition papers of overtime claims between $127,000 to $132,000. Aff. Jeffrey G. Smith in Supp. of Opp'n. to Mot. to Compel Arbitration at ¶ 5. Assuming this self-reported value of claims, the Court finds that LaVoice's circumstances differ drastically on their face from those of the plaintiffs in either the Amex line of cases or

17

Sutherland.   Plaintiffs in those cases could each only claim *de minimus* damages of less than $6000.[8]

With respect to the estimated attorneys' fees, the Court finds that, unlike the arbitration agreement at issue in Sutherland, the arbitration agreements at issue in the instant case would permit LaVoice to recover an award of attorneys' fees.   Since the agreements authorize the arbitrator(s) to "award whatever remedies would be available to the parties in a court of law" and awards of attorneys' fees are mandatory for the prevailing party under the FLSA, the agreements themselves crate no impediment to LaVoice's recovery of fees.   See Ex. 6 to Decl. of Matthew Levitan at 20;   Ex. 10 to Decl. of Matthew Levitan at 3; and 29 U.S.C. § 216(b) ("The court in such action shall . . . allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.")   The instant case is therefore distinguishable from Sutherland and its consideration of attorneys' fees in determining whether plaintiff's claims were unarbitrable.   See also Banus v. Citigroup Global Mkts., Inc., No. 09-7128, 2010 WL 1643780, at *10 n.61 (S.D.N.Y. Apr. 23, 2010) (enforcing class action waiver in arbitration

---

[8] Plaintiffs in Amex I and II claimed median damages of $5,252 with treble damages.  Amex I, 554 F.3d at 317.  Plaintiff in Sutherland claimed damages of $3,734.04 with liquidated damges.  Sutherland, 768 F. Supp. 2d at 551.

agreement where plaintiff's estimated recovery was $45,675.36 and attorney's fees would be "at least $100,000.")

Turning to LaVoice's estimated expert costs, the Court finds that these estimated costs are "too speculative to justify the invalidation of an arbitration agreement." Randolph, 531 U.S. at 91. Two factors figure prominently in the Court's finding that the proposed costs are speculative: (1) LaVoice concedes that he cannot be certain that he will utilize an expert witness, Pl's Mem. of Law in Opp'n. to Def.'s Mot. to Compel Arbitration at 5; and (2) whether LaVoice's expert's testimony would even be admissible remains unclear to the Court.

With respect to the second factor, LaVoice states that his expert's testimony will be used to rebut the affirmative defense that LaVoice is exempt from the FLSA and New York state law under the "administrative" and "professional" exemptions of both laws. In support, LaVoice's expert states that he has been asked by counsel to "clarify the difference between financial or investment advisors . . . from stock or investment brokers." Aff. Of James L. Bicksler in Supp. of Opp. to Mot. to Compel Arbitration at ¶ 7. LaVoice has provided no guidance to the Court, however, for how this testimony relates to determining whether either the "administrative" or "professional" FLSA

exemption applies.[9]  This lack of clarity, coupled with LaVoice's uncertainty as to whether he would even seek to introduce the expert's testimony, leads the Court to find that the estimated expert costs are insufficient to support a finding that the arbitration agreements are unenforceable.

On the issue of both LaVoice and his counsel's professed disinclination to pursue LaVoice's claims individually, the Court finds no legal basis for giving weight to these statements.  LaVoice has cited to no authority to support any argument that the Court should give consideration to his and counsel's unwillingness to pursue his claims in the absence of a class, and particularly given the real damages at issue, the Court cannot help but find LaVoice and counsel's statements to be self-serving and irrelevant.

Finally, in an apparent attempt to minimize the Court's valuation of his claims, LaVoice argues that the Court should take into account his probability of success and reduce any estimate of his maximum damages by as much as 90%.  Pl. Sur. Mem. of Law in Opp'n. to Defs. Mot. to Compel Arbitration at 5.

---

[9] In order to determine whether an exemption to the FLSA applies, the Court looks first to the activities of the employee, and then to whether those activities exempt the employee from FLSA requirements.  See Mota v. Imperial Parking Sys., No. 08-Civ-9526, 2010 WL 3377497, at *2-3 (S.D.N.Y. Aug. 24, 2010).  The first question as to activities of the employee is "a question of fact," while the second question of whether his particular activities excluded him from the benefits of the FLSA "is a question of law."  Id. at *3.

In support of this argument, LaVoice relies upon dicta from Amex
I which states that "[e]ven with respect to reasonable
attorney's fees . . . the plaintiffs must include the risk of
losing, and thereby not recovering any fees, in their evaluation
of their suit's potential costs." 554 F.3d at 318. The Court
finds LaVoice's arguments entirely unpersuasive. As an initial
matter, the Amex decisions themselves did not adopt the type of
probability offset proposed by LaVoice, and LaVoice has cited to
no other authority which would support such an approach.
Secondly, even if the Court were to accept LaVoice's argument
that Amex I requires courts to consider "risk of losing" as a
factor in evaluating the enforceability of an arbitration
agreement's terms, LaVoice has provided no support for why his
proposed 10% probability of success is anything more than pure
speculation.

In light of the foregoing, the Court finds that LaVoice has
not met his "burden of showing the likelihood of incurring" such
"prohibitively expensive" costs such that the class waiver
provisions in the instant action would preclude him from
bringing his claims against Defendants in an individual or
collective capacity. Amex II, 634 F.3d at 197 (citing Randolph,
531 U.S. at 92.)

**CONCLUSION**

For the reasons discussed, the Court GRANTS Defendants'
Motion to Compel Arbitration and Stay the Action pending the
completion of arbitration.

The Clerk of the Court is directed to terminate motion #10
from the ECF docket.

**SO ORDERED:**

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Dated:      New York, New York
            January 13, 2011